UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 2:19-CR-115 |
| vs. | ) | |
| MELVIN CHISM, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Before the Court are Defendant's Motions to Suppress [Docs. 44 & 57] seeking the suppression of all or part of the statement he made to law enforcement officers on May 7, 2019. The United States filed Responses [Docs. 54 & 82] opposing Defendant's Motions. The Court conducted an evidentiary hearing on the motions on March 23, 2021. Defendant and his counsel, Jerry Laughlin, Esq., along with Assistant United States Attorney Emily Swecker, Esq. were present for the hearing. Special Agent Thomas Garrison of the Tennessee Bureau of Investigation and former Sergeant with the Johnson City Police Department ("JCPD"), Investigator Toma Sparks with JCPD, as well as Defendant, testified at the hearing.

This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motions to Suppress [Docs. 44 & 57] be **DENIED**.

## I. BACKGROUND

On August 13, 2019, a federal grand jury returned an indictment against Defendant charging him with one count of possession with the intent to distribute five (5) grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1); and one count of possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). These charges arose out of incidents that occurred on May 7, 2019.

Defendant first seeks to suppress his entire statement [Doc. 44] on the grounds that he was not advised of his *Miranda* rights prior to arriving at the JCPD on May 7, 2019, asserting that any statement made prior to receiving *Miranda* warnings is inadmissible. Additionally, Defendant asserts that although he was advised of his rights while at the police station, he was incompetent to knowingly and voluntarily waive those rights because he was under the influence of drugs. Alternatively, Defendant contends that even if the Court find he knowingly and voluntarily waived his *Miranda* rights, the Court should suppress those portions of his recorded statement where he exercised his right not to produce a DNA sample and where he was questioned about prior gang affiliation and an unrelated homicide investigation. [Docs. 57 & 81]. The United States has stipulated that it will not attempt to introduce the portions of Defendant's interviews related to Defendant's prior gang affiliation or the unrelated homicide investigation. [Doc. 72, p. 2]. Additionally, as Defendant has stipulated both his status as a felon and his knowledge of his felon status [Doc. 66], the United States will not attempt to introduce in its case-in-chief any portion of Defendant's interviews where his prior arrests or convictions are discussed. [Doc. 72, p. 1].

There are two separate instances during Defendant's interviews when Defendant refuses to consent to a DNA swab. During the latter of these instances, Defendant refuses to consent but does not make any statements related to the underlying facts of the case. The United States has stipulated that it will not attempt to introduce this portion of Defendant's interview. [Doc. 72, p. 2]. On the other hand, the portion of Defendant's statement that includes his initial refusal to consent to a DNA swab, during Clip 5 from minute marker 2:55 to 7:05, is still a point of contention. [Docs. 72, p. 2 & 81, p. 2].

II. FINDINGS OF FACT

    a. Testimony of Special Agent Thomas Garrison

Special Agent Thomas Garrison ("Agent Garrison") testified that he has been an investigator in the Tennessee Bureau of Investigation ("TBI") drug investigation division since August 2019. Prior to joining the TBI, Agent Garrison worked for JCPD from 2008 until leaving to join the TBI in 2019. While at JCPD, Agent Garrison first worked as a patrol officer for two years and then went to the narcotics unit. Agent Garrison was serving as a narcotics investigation sergeant on May 7, 2019, the date of Defendant's arrest. Agent Garrison advised that when Defendant arrived at JCPD after his arrest he was placed in a small interview room. The room was wired for audio and video recording and Defendant's interview was recorded. Agent Garrison stated he explained the circumstances of the interview to Defendant and advised him of his *Miranda* rights and Defendant then signed a written waiver of his *Miranda* rights and verbally consented to the interview.[1]

Agent Garrison stated Defendant indicated he understood his *Miranda* rights and did not ask for any of his rights to be repeated. Agent Garrison testified that Defendant did not appear to

---

[1] The signed *Miranda* waiver was introduced as an exhibit.

be intoxicated nor did he say he was under the influence of any substance. Agent Garrison did not ask Defendant when he had last used drugs and Defendant was not drug screened prior to being interviewed. Defendant did lean his head against the wall and close his eyes and at one point even attempted to lay his head on the table, but Agent Garrison interpreted this to be an indication that Defendant was tired or did not want to be there rather than a sign of intoxication.

Although it was somewhat "all over the place," Defendant was able to give Agent Garrison an explanation of the events that led to his arrest. Agent Garrison's interview of Defendant lasted approximately 20 minutes. Agent Garrison was aware that Defendant had prior convictions and during the interview they discussed Defendant's history and Defendant indicated he had served a lengthy prison sentence. Agent Garrison was also aware that Defendant was being charged with possession of methamphetamine and had been arrested with needles and syringes in his possession approximately an hour before the interview began. Agent Garrison noted that Defendant's behavior would not have indicated Defendant being under the influence of methamphetamine because in his experience methamphetamine use tends to keep people awake and make them more aggressive as opposed to sleepy. Defendant was later interviewed by other officers and remained in the interview room between interviews.

### b. Testimony of Investigator Toma Sparks

Investigator Toma Sparks ("Investigator Sparks"), a fifteen-year veteran of JCPD, and another officer interviewed Defendant at approximately 2:30 p.m. on May 7, 2019. Investigator Sparks read Defendant his *Miranda* rights from a standard *Miranda* rights forms and Defendant again signed a written waiver[2] and consented to an interview. Investigator Sparks testified that his interview of Defendant lasted approximately one hour.

---

[2] The second *Miranda* waiver signed by Defendant was also entered as an exhibit. The Court notes that Defendant's signature is consistent across both documents.

During the interview, Defendant appeared tired and again leaned his head against the wall and closed his eyes, but Investigator Sparks testified that Defendant did not appear intoxicated and did not say he had taken any drugs. Investigator Sparks was aware Defendant had methamphetamine in his possession when he was arrested. Investigator Sparks stated Defendant was able to provide detailed answers to questions and nothing that occurred during the interview caused him any concern about Defendant's ability to understand what was happening.

### c. Video of Defendant's Statement

The video of Defendant's full statement, including both interviews, was tendered to the Court prior to the hearing and the parties agreed on the record that it was unnecessary to play the video of Defendant's interviews during the hearing. The Court reviewed the video of Defendant's interviews and finds it to be consistent with the testimony of Special Agent Garrison and Investigator Sparks. Of particular note to the Court, soon after Defendant was placed into the interrogation room he advised a unidentified uniformed officer that he was scheduled to work at Wendy's later that day and asked him to call his manager to let her know he would be unable to work his shift.[3] Additionally, Defendant was able to provide his manager's name with no difficulty.

Later, Defendant advised that he had received a GED and completed some college courses and had no difficulty reading and writing. At one point, Defendant interrupted an explanation of why he was there and what was happening to tell officers that he knew all of this already and advised that he was familiar with both state and federal criminal systems. While Defendant did lean his head against the wall, lean back in his chair, and close his eyes at various points while in the interview room Defendant appeared to be bored or tired and attempting to sleep rather than

---

[3] Although this exchange was recorded, the officer's identity is not apparent from the video.

intoxicated. Defendant's speech was clear, he was able to answer questions coherently and even asked questions about his arrest and charges. He also verbally confirmed he understood each of his *Miranda* rights when they were read to him by both Special Agent Garrison and Investigator Sparks in addition to signing the waiver forms.

Defendant did tell Investigator Sparks that he was unable to read a section of the waiver form when asked to read it aloud, but upon Investigator Sparks' inquiry as to why, Defendant said it was because his eyes were blurry possibly because he had gotten sweat in them. Defendant did not mention intoxication as contributing to his inability to read the form aloud. Additionally, Defendant was still able to see the form well enough to sign in the appropriate place and verbally confirmed again that he understood his rights. Defendant was able to answer questions during multiple interviews and did not "nod off" or become unresponsive during questioning or trail off while speaking. Defendant was able to recall specific information while being questioned, such as dates of past events, and to use context clues to determine about whom or what officers wanted information.

Regarding Defendant's refusal to consent to provide a DNA sample, the video shows that at 3:51 p.m., also recorded as Clip 5, minute marker 2:55, an officer enters the room and asks Defendant if he will consent to a DNA swab so DNA testing can be performed on the firearm recovered during Defendant's arrest. Defendant does not immediately decline, but instead asks what the DNA testing will prove. The officer explains that because Defendant claims the gun is not his DNA testing can be conducted to determine if Defendant's DNA is on the gun which could bolster Defendant's claim that the gun does not belong to him. Defendant responds that such testing will not exonerate him because everybody has already touched the gun, and further specifies that he has already touched the gun and he does not know if he was the last person to

touch the gun or not so a DNA test could incriminate him as opposed to exonerating him. The statements regarding who had touched the gun, including the fact that Defendant himself had done so, are made before Defendant declines to provide a DNA sample, at minute marker 5:03. Even then, Defendant does not simply decline, but says he cannot take the chance of providing a DNA sample for testing because his fingerprints are on the gun and goes on to explain the circumstances of when and how he last touched the gun.

During this interaction the officer asks Defendant whether he will consent to a DNA sample multiple times in order to obtain a straight answer from Defendant. Once Defendant finally states that he will not consent to a DNA swab because he believes doing so would be gambling with his life because he knows he has touched the gun before, the officer accepts Defendant's refusal and leaves the room.

### d. Testimony of Defendant

Defendant took the stand to testify on his own behalf during the hearing on his suppression motions. The Court advised Defendant of his right to remain silent and warned that he would be subject to cross-examination and that anything he said during the hearing could be used against him at trial. Defendant stated he understood but wished to go forward with providing his testimony.

Defendant testified that on the date of his arrest he was employed at Wendy's on Peoples Street in Johnson City, Tennessee and worked the 5:00 p.m. to closing shift, which typically meant he got off work between 1:00 and 2:30 a.m. Defendant stated he had worked the night prior to his arrest and when he got off work early on the morning of May 7, 2019 he went across the street to IHOP to wait for a ride. While waiting, he went into the IHOP restroom multiple times to inject

methamphetamine.[4] He then left IHOP and went to a friend's house on North Barton Street in Johnson City.

Defendant testified that he has been injecting methamphetamine for approximately four years and it affects him differently depending on what he is doing, and causes him to see, hear, and experience things in a completely different way than normal. Defendant further testified that it was his routine practice to inject methamphetamine right after work to increase his energy and then inject again once he felt himself getting sleepy and his energy level going back down. At the same time, he claimed that using too much methamphetamine causes sleepiness and affects his ability to comprehend things and make rational decisions and judgments. Once Defendant arrived at his friend's house, he ate, played with his friend's dog, and smoked methamphetamine with friends. Defendant testified he also went into the bathroom and injected methamphetamine.

Defendant was unable to say how much methamphetamine he used between the time he left work and the time of his arrest. He admitted he has built up a tolerance to methamphetamine and as a result can use greater quantities and experience less effects. Defendant explained that in order to say how much methamphetamine he used leading up to his arrest and subsequent questioning he would have had to weigh the methamphetamine before he injected or smoked it and he does not weigh methamphetamine if it is for his personal use. He stated the methamphetamine he used that day was part of a one-ounce purchase of methamphetamine he made from someone called "Head" on May 6, 2019. Defendant testified he knew he purchased an ounce of methamphetamine from "Head" because he uses a scale to weigh methamphetamine when he buys it from or sells it to someone else. Defendant admitted he uses and sells

---

[4] Defendant testified he could not say exactly how many times he went into the restroom to inject methamphetamine but that it was at least four times.

methamphetamine and stated that most methamphetamine users also sell methamphetamine to make money to support their drug habit.

Defendant testified that he knew he talked to officers with the JCPD after his arrest but said he was feeling the effects of all the drugs he had taken and this was causing him to "nod," a sensation Defendant described as being incoherent to what is happening around him because his mind is racing and thinking about too many things at once which to an unknowing observer would make it appear that he was sleeping. He also testified that he has narcolepsy. Defendant further advised that using methamphetamine causes him to have memory lapses and he does not remember most of his interviews with officers, or the events leading up to and surrounding his arrest and had to piece together what happened from information he received from the Government in discovery. Defendant stated that he did not recall being advised of his *Miranda* rights and at the time he did not understand his right not to answer questions because he was "in a whole different state of mind" due to the drugs he had taken. On cross examination, Defendant did admit that he was familiar with *Miranda* rights even prior to the arrest at issue.

Defendant testified that he specifically recalled telling officers he was on methamphetamine and asking for water. He also testified that he was asked if he needed medical attention due to the sweating and dry mouth he was experiencing.[5] Defendant said that he could not remember with which officers he had this exchange. Upon further questioning, Defendant testified that he remembered officers asking him about methamphetamine use and that he never said he was not a drug user. He stated he thought he told officers he and the other people at the

---

[5] The video of Defendant's interviews at JCPD does reflect Defendant asking for, and being given, water. Defendant also mentioned having dry mouth and he did appear to be sweating when he first entered the interview room; however, he was wearing a jacket that it appeared he had tried to remove but was unable to take off completely due to being handcuffed. An officer removed Defendant's handcuffs and assisted him in removing the jacket immediately upon placing Defendant in the interview room. At no time during the video did Defendant mention being under the influence of methamphetamine, nor was there any discussion of Defendant needing medical attention.

residence on North Barton Street were all getting high but was unable to say for sure. Defendant was also able to remember refusing to provide a sample of his DNA and the conversation he had with officers surrounding his refusal but testified he does not understand why he made some of the statements that he did, particularly regarding possessing the firearm. Defendant testified he was scheduled to work at Wendy's on the day of his arrest, and stated he "might" have asked officers to call his manager to let her know he would not be coming to work that evening but could not remember for sure.

Defendant testified he has not used methamphetamine since prior to his arrest on May 7, 2019 but when he was administered a drug screen in the Washington County jail on May 14, 2019, he tested positive for methamphetamine. Defendant claims he must have still had some of the methamphetamine he used on May 7, 2019 in his system a week later when he was drug tested indicating he used an excessively large quantity of methamphetamine on that date. Defendant denied using drugs while incarcerated. While the proof demonstrated that Defendant was written up in December 2019 for unauthorized possession of drugs and lying or deception while in the Washington County jail,[6] he testified that the unauthorized substance was a blood pressure pill that was not prescribed to him. Defendant further contended that he did not lie about it but could not provide an explanation for why he was charged with lying or deception. Defendant acknowledged he admitted guilt and signed the disciplinary form.

### e. Witness Credibility

The Court finds Special Agent Garrison and Investigator Sparks to be credible witnesses, noting that their testimony was consistent with the video of Defendant's interviews at JCPD. Both are veteran officers with multiple years of training and experience in recognizing intoxication.

---

[6] The disciplinary form reflecting these infractions was introduced as Exhibit 5.

Additionally, both officers obtained signed *Miranda* rights waiver forms from Defendant before conducting an interview. Conversely, the Court does not find Defendant's testimony to be credible. Defendant was conveniently able to remember those portions of his interactions with law enforcement which benefited him while suffering from methamphetamine-induced memory lapses that robbed him of all memory of those portions which would have been detrimental. Further, several of Defendant's claims were contradicted by the objective video evidence of his interviews at JCPD.

### III. ANALYSIS

#### a. Defendant's Pre-*Miranda* Statements

Defendant's Motion asserts that he was not advised of his *Miranda* rights until he arrived at JCPD after his arrest and seeks to suppress "any statements he may have made to law enforcement officers on May 7, 2019, while he was in custody." [Doc. 44, p. 3]. Defendant's memorandum in support of this Motion [Doc. 48] focuses exclusively on statements Defendant made after he arrived at JCPD and was advised of his *Miranda* rights. Likewise, Defendant's Motion provides no legal argument for excluding any statements Defendant made before arriving at JCPD and, in fact, does not even state whether Defendant made any such statements.

In its Response, the United States plainly states Defendant did make pre-*Miranda* statements, but argues that these statements were either unprompted by law enforcement or were made in response to questioning under the public safety exception and are admissible for those reasons.[7] [Doc. 54, p. 1-2]. The Government's Response states that the pre-*Miranda* statements were recorded by dash camera, although the Government did not introduce this dash camera

---

[7] While the United States alleges Defendant's statements made in the back of the patrol car would be admissible, it further states it does not intend to introduce these statements at trial. [Doc. 54, p. 5].

footage or any witness testimony as to the circumstances surrounding any statements made by Defendant prior to his arrival at JCPD during the motion hearing.

On a motion to suppress evidence regarding constitutional claims, the burden is on the movant to establish a prima facie case for suppression but when such a case has been made the burden shifts to the Government. *United States v. Murrie*, 534 F.2d 695, 697-98 (6th Cir. 1976) (citing *United States v. Thompson*, 409 F.2d 113 (6th Cir. 1969). To establish a prima facie case, the movant is obligated to present some proof designed to convince the Court his motion should be granted. *Thompson*, 409 F.2d at 117. Here, Defendant merely made an oblique reference to pre-*Miranda* statements in his written Motion and provided no further context or information upon which the Court could base a decision that such statements were unconstitutionally obtained. As such, Defendant did not establish the prima facie case required to shift the burden to the United States. As a result, the Court cannot find that pre-*Miranda* statements made by Defendant were obtained in violation of his constitutional rights and consequently cannot find that the statements should be suppressed.

### b. Defendant's Ability to Knowingly and Voluntarily Waive *Miranda* Rights

The Court now turns to the statements Defendant made once he had arrived at JCPD and was twice provided with *Miranda* warnings. In determining whether these statements are admissible, the Court must first analyze whether Defendant was capable of waiving his *Miranda* rights at that time. A defendant may waive the rights conveyed in *Miranda* warnings so long as the waiver is made knowingly, voluntarily, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The inquiry to determine whether such a waiver was made consists of two distinct parts: 1) was the waiver voluntary in the sense that it was a deliberate choice rather than the result of intimidation, coercion, or deception; and 2) was the waiver made with full awareness of both

the nature of the rights being waived and the consequences of waiver such that the decision was knowingly and intelligently made. *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987) (citing *Moran*, 475 U.S. at 421). The Court must consider the totality of the circumstances surrounding the interrogation when determining whether a waiver was made voluntarily, knowingly, and intelligently. *Id.*; *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009).

Specifically, "courts consider the defendant's age, education, intelligence, prior experience with the criminal justice system, the length and nature of the questioning, the advice regarding *Miranda* rights, and the use of physical punishment, such as deprivation of food or sleep" to determine whether a waiver was knowingly and intelligently made. *United States v. Hampton*, 572 F. App'x 430, 433 (6th Cir. 2014) (citing *Murphy v. Ohio,* 551 F.3d 485, 511 (6th Cir.2009)). With regard to intoxicated defendants, the Sixth Circuit has noted that factors such as the defendant's "age, experience, education, background, and intelligence, and ... capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights" should be examined. *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)). Further, the "question of [a defendant's] incapacitating intoxication, or lack thereof, [is] simply a credibility issue." *Id.* (quoting *United States v. Jones,* No. 90–3693, 1991 WL 105751, at *3 (6th Cir. June 18, 1991)). Importantly, the Government need only prove a Miranda waiver was made voluntarily, knowingly, and intelligently, by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). !

Additionally, "[t]he underlying police-regulatory purpose of *Miranda* compels that these circumstances be examined, in their totality, primarily from the perspective of the police."

*Garner*, 557 F.3d at 263. As explained by the Sixth Circuit, "[t]he knowledge of the police is vital. If they have no reason to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior." *Id.* at 262 (quoting *Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)) (internal citations omitted).

Here, Defendant has made no allegations that the waiver of his *Miranda* rights was the product of intimidation, coercion, or deception. Instead, Defendant alleges that he was unable to knowingly and intelligently waive his *Miranda* rights because he was under the influence of large quantities of methamphetamine at the time. Further, the video recording of Defendant's statement reveals no signs of intimidation, coercion, or deception on the part of law enforcement. As such, the Court finds the voluntariness prong of the waiver inquiry is satisfied and will focus the remainder of its analysis on the knowing and intelligent waiver prong of the inquiry.

As noted above, the totality of the circumstances surrounding an interrogation and waiver of *Miranda* rights must be analyzed from the perspective of the law enforcement officers who conducted the interrogation and obtained the waiver. *Garner*, 557 F.3d at 263. In the case at hand, the officers who interviewed Defendant at JCPD were aware that Defendant was experienced with the criminal justice system, both due to his prior criminal record and because he advised them of his familiarity with the state and federal court systems during his interview. Defendant told officers that he completed his GED and some college and was able to read and write without difficulty, and he verbally confirmed that he understood his *Miranda* rights on two separate occasions and signed two separate *Miranda* waiver forms. Defendant did not ask any questions about his *Miranda* rights, but did ask questions about other topics, including why he had been arrested. When asked if he needed anything, Defendant asked for water and was provided with water promptly. He told

officers where he worked and even asked them to call his manager, who he identified by name, to let her know he would not be coming to work that evening.

While Defendant was detained in an interview room for approximately three-and-a-half hours in total, he was questioned multiple times by different officers with breaks in between and none of these interviews lasted more than an hour. Additionally, Defendant was able to discuss with officers the issue of whether he would consent to a DNA swab, ultimately refusing to do so because he recognized that giving a DNA sample would not be in his best interest. Defendant was able to answer questions and provide specific and detailed information when prompted. Despite being asked about drug use, Defendant did not advise officers during any of his interviews that he was under the influence. Although Defendant did lean against the wall and close his eyes at times, this was primarily between interviews when he was alone in the interview room and it was logical for officers to interpret this as a sign of boredom or sleepiness as opposed to intoxication, particularly when those actions were taken in context with how Defendant behaved while they were actively interviewing him.

The facts in this matter are strikingly similar to those described in *United States v. Jones.*, No. 90–3693, 1991 WL 105751 (6th Cir. June 18, 1991). In *Jones*, the defendant alleged his *Miranda* waiver could not have been knowing and intelligent due to intoxication. The defendant testified that he was intoxicated to the point of being unable to remember committing the crime with which he was charged, much less giving a confession to law enforcement. *Id.* at *3. At a hearing on his motion to suppress, police witnesses testified that either Jones was not intoxicated at all or in the alternative, that it did not affect his competency or volition. *Id.* The trial court found Jones' statement to be admissible and the Sixth Circuit agreed, holding that the determination of Jones' ability to knowingly and intelligently waive his *Miranda* rights came down

to a credibility determination and there was more than ample evidence for a trier of fact to legitimately conclude that Jones knew what he was doing when he waived his *Miranda* rights. *Id.* Moreover, in *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008), the Sixth Circuit upheld the trial court's determination that the defendant's *Miranda* waiver was knowingly made despite finding that the defendant was under the influence of Vicodin and marijuana at the time his statement was provided. In *Dunn*, officers testified that the defendant was alert and able to respond to questions, appeared to understand his *Miranda* rights, and an audio recording of the interview revealed that defendant was coherent and lucid. *Id.*

Here, based on the testimony of Special Agent Garrison and Investigator Sparks as well as the video recording of Defendant's interviews, the totality of the circumstances demonstrate that Defendant knowingly and intelligently waived his *Miranda* rights. Defendant did not display any outward signs of being unable to understand his rights or an inability to comprehend the consequences of waiving them. The only basis for a finding that Defendant did not knowingly and intelligently waive his *Miranda* rights is Defendant's own testimony that he was too intoxicated to understand his rights or remember waiving them. As in *Jones*, this comes down to a credibility issue, and as referenced above, the Court finds the testimony of Special Agent Garrison and Investigator Sparks to be credible and consistent with the video of Defendant's interview while being unable to credit Defendant's testimony. In considering the totality of the circumstances, the Court must conclude that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. !

    **c. Statements Surrounding Defendant's Refusal to Provide a DNA Sample**

Finally, the Court must address the portion of Defendant's recorded statement surrounding his refusal to provide a DNA sample. Defendant argues that his statement declining to provide a DNA

sample was an exercise of his Fourth Amendment right against unreasonable searches of his person and should be inadmissible for that reason [Doc. 57, p. 3]. Additionally, Defendant alleges that this portion of his statement is not incriminating, is probative of nothing, and any probative value it does have is outweighed by prejudicial effect. *Id.* The United States responds that this portion of Defendant's statement is admissible because Defendant did not simply refuse to give a DNA sample, but rather made statements that are directly probative to whether he possessed the firearm in question [Doc. 72, p. 2]. The Government provided examples of these statements, including "Everybody's done touched that gun," and "My fingerprints are going to be on that gun. I know they're going to be on that gun because I touched that gun."[8] The United States argues such statements are highly probative and any prejudicial effect arising from the jury learning of Defendant's refusal to consent to a DNA swab is tempered by the fact that Defendant later consented. In fact, Defendant himself filed motion [Doc. 43] requesting DNA testing of the firearm in question and provided a DNA sample for comparison to facilitate this testing.

Of note, Defendant seeks to exclude the portion of his statement recorded at Clip 5, minute marker 2:55-7:05. While the officer does enter the room at 2:55 and ask Defendant if he will consent to a DNA test, Defendant does not actually give an answer to this request until 5:03. Defendant makes several statements pertaining to the firearm in question and whether his DNA will be on it prior to refusing to provide a DNA sample. Additionally, even when Defendant does refuse, he does not simply say no but volunteers a lengthy explanation of his reasoning including the circumstances surrounding his touching of the gun.

It is well-established that the exercise of a constitutional right, be it refusal to consent to a search or provide a statement, should not be used as evidence of guilt. *United States v. Clariot*,

---

[8] It should be noted that Defendant had been advised of and waived his *Miranda* rights twice prior to making these statements.

655 F.3d 550, 556 (6th Cir. 2011) (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986); *Griffin v. California*, 380 U.S. 609, 615 (1965). As an initial matter, the Court notes that if Defendant had merely refused to consent to the DNA swab and said nothing more, without question his refusal to consent would be inadmissible; however, in this case the Government is not seeking to have a jury infer any guilt on the part of Defendant resulting from his refusal to consent to testing. Rather, the Government seeks to introduce the statements Defendant made in response to being asked to consent to a DNA swab because they provide direct information regarding Defendant's possession of the firearm at issue. Once Defendant finally provided a responsive answer to the officer's inquiry regarding a DNA sample, the encounter was terminated, and the officer left the room.

Defendant further argues that this portion of his statement should be excluded under Rule 403 of the Federal Rules of Evidence because any probative value is substantially outweighed by the unfair prejudice that will result from the jury learning of his refusal to consent to provide a DNA sample. [Doc. 58, p. 4]. In contrast, the United States argues that this portion of Defendant's statement is highly probative as it directly relates to whether Defendant was in possession of a firearm and as such, the probative value of the statement is not substantially outweighed by any prejudice to Defendant. The Court finds that the probative value of this portion of Defendant's testimony does indeed substantially outweigh any potential prejudice to Defendant as the statement addresses an issue at the heart of the gun charges brought against him; i.e. his knowing possession of the weapon. The Court further finds that any prejudice resulting from Defendant's initial refusal to provide a DNA sample will be tempered by the fact he later consented to a DNA swab and also filed his own motion for DNA testing to be conducted on the firearm in question.

For the above reasons, the Court finds the portion of Defendant's statement contained in Clip 5, minute marker 2:55-7:05 contains statements that go well beyond a mere refusal to consent to a DNA swab and are highly probative of an essential element of the gun charges brought against Defendant. Additionally, the probative value of the statements far outweighs any prejudice to Defendant resulting from their admission into evidence; therefore, the Court concludes that this portion of Defendant's statement is admissible and should not be suppressed.

IV. **CONCLUSION**

For the reasons outlined above, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress[9] his statement to law enforcement [Docs. 44 & 57] be **DENIED**.[10]

Respectfully Submitted,

/s Cynthia Richardson Wyrick
United States Magistrate Judge

---

[9] The Court does note that portions of Defendant's suppression motions have already been resolved via joint stipulations entered into by the United States and Defendant. This Report & Recommendation does not address those issues as they have already been resolved and the recommendation that the motions be dismissed is not intended to have any impact on those stipuations.

[10] Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).